**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

DMITRIY ITKIS, derivatively on behalf of ZYNERBA PHARMACEUTICALS, INC.,

Plaintiff,

vs.

ARMANDO ANIDO, JAMES E. FICKENSCHER, JOHN P. BUTLER, WARREN D. COOPER, WILLIAM J. FEDERICI, THOMAS L. HARRISON, DANIEL L. KISNER, KENNETH I. MOCH, and PAMELA STEPHENSON,

Defendants,

and

ZYNERBA PHARMACEUTICALS, INC.,

Nominal Defendant.

**C.A. No.**

**DEMAND FOR JURY TRIAL**

# VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Dmitriy Itkis ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Zynerba Pharmaceuticals, Inc. ("Zynerba" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Armando Anido ("Anido"), James E. Fickenscher ("Fickenscher"), John P. Butler ("Butler"), Warren D. Cooper ("Cooper"), William J. Federici ("Federici"), Thomas L. Harrison ("Harrison"), Daniel L. Kisner ("Kisner"), Kenneth I. Moch ("Moch"), and Pamela Stephenson ("Stephenson") (collectively, the "Individual Defendants," and together with Zynerba, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Zynerba, unjust enrichment, waste

of corporate assets, violations of Sections 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Zynerba, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by Zynerba's directors and officers from March 11, 2019 through September 17, 2019, both dates inclusive (the "Relevant Period").

2. Based in Devon, Pennsylvania, Zynerba is a specialty pharmaceutical company focused on the development and commercialization of its supposed proprietary next-generation synthetic cannabinoid ("CBD")[1] therapeutics formulated for transdermal delivery, i.e. a route of administration wherein active ingredients are delivered across the skin for systemic distribution. Specifically, Zynerba seeks to utilize its pharmaceutically produced transdermal cannabinoid therapies for treatment of rare and near-rare neuropsychiatric disorders. Currently, Zynerba's only

---

[1] Cannabinoids are a class of compounds derived from Cannabis plants. The two primary cannabinoids contained in Cannabis are CBD, which is not psychoactive, and Δ9-tetrahydrocannabinol ("THC"). CBD may have positive effects on treating refractory epilepsy, arthritis and Fragile X Syndrome ("FXS"), and THC may have positive effects on treating pain.

current drug candidate is ZYN002,[2] or Zygel. Zygel is a transdermal CBD gel for the treatment of patients suffering from, among other neuropsychiatric disorders, a heterogeneous group of rare and ultra-rare epilepsies known as developmental and epileptic encephalopathies ("DEE").

3. The Company was initially founded in 2007 as a Delaware corporation based in Kentucky, under the moniker AllTranz, Inc. ("AllTranz"). Later, after a series of mergers, the Company was reorganized, recapitalized, rebranded as Zynerba, and then relocated to Pennsylvania. Then, on August 5, 2015, the Company went public. Since, the Company has continuously operated at a net loss and has consequently been forced to finance its operations through a series of offerings of Zynerba's common stock.

4. As the use of medicinal cannabis has become increasingly legal throughout the United States, there has been an associated steady increase in demand for products that utilize CBD for the treatment of disorders, including epilepsy. For example, the U.S. Food and Drug Administration ("FDA") has approved one cannabis-derived drug product named Epidiolex. However, to date, the Company has failed to secure FDA approval for Zygel, or any other drug candidate.

5. After a Phase 1 clinical trial that supposedly demonstrated potentially promising results, the Individual Defendants began touting Zygel as "safe and well tolerated" and commenced a Phase II clinical trial in April 2018 labeled the BELIEVE 1 Trial. The BELIEVE 1 Trial was a six-month clinical trial in an open label[3] multi-dose Phase 2 clinical setting designed

---

[2] The Company's only other drug candidate, dubbed ZYN001, failed to successfully make it through a Phase 1 clinical trial.

[3] An open-label trial is a type of clinical trial in which information is not withheld from trial participants, i.e. both the researchers and participants know which treatment is being administered. By way of comparison, a double-blinded trial is a type of clinical trial in which information is withheld from both the researchers and the participants. This is typically done to reduce bias.

to evaluate the efficacy and safety of Zygel in children and adolescents, ages 3 to 17, suffering from DEE as classified by the International League Against Epilepsy (the "Phase 2 Clinical Trial").

6. While nearly every patient participating in the Phase 2 Clinical Trial suffered treatment emergent adverse events[4] and a majority experienced a treatment related adverse event,[5] beginning on March 11, 2019, and throughout the Relevant Period, the Individual Defendants touted the trial and the Company's sole drug candidate as a safe and effective treatment for epilepsy. Their misrepresentations were intended to—and did—artificially pump up the value of the Company's share price so that the Individual Defendants could cash in on equity financing and keep the Company afloat.

7. The Individual Defendants' vulturine tactics largely succeeded. After trading at around $4-$5 per share at the start of the Relevant Period, the Company's shares began skyrocketing. On May 17, 2019, Zynerba stock reached an intra-day high of $16.47 per share, representing a significant increase from the start of the Relevant Period, before closing at $15.48 per share.

8. However, the truth emerged on September 18, 2019, when the Company issued a press release (the "September 2019 Press Release") that announced that 96% of patients in the Phase 2 Clinical Trial experienced a treatment emergent adverse event, 60% of patients experienced a treatment related adverse event, and over 20% of patients reported a serious adverse event.[6]

---

[4] A treatment emergent adverse event is any event that was not present prior to the initiation of the drug treatment or any event already present that worsens in either intensity or frequency following exposure to the drug treatment.

[5] An adverse event can be any unfavorable and unintended sign, symptom, or disease temporarily associated with the use of a drug, without any judgment as to causality or relationship to the drug.

[6] A serious adverse event is any untoward medical occurrence that, at any dose, results in death, is life-threatening, requires inpatient hospitalization or causes prolongation of existing

9. On this news, the price of the Company's stock fell $2.46 per share, or nearly 22%, from $11.30 per share at the close of trading on September 17, 2019, to $8.84 per share at the close of trading on September 18, 2019, on very heavy trading volume. To date, the value of the Company's common stock has not recovered and has consistently traded below $8.84 per share. For instance, as of December 3, 2020, Zynerba's common stock closed at $4.50 per share.

10. During the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to make a series of materially false and/or misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) nearly every patient that participated in the Phase 2 Clinical Trial experienced treatment emergent adverse events; (2) most patients that participated in the Phase 2 Clinical Trial endured treatment related adverse events; (3) more than 20% of the patients that participated in the Phase 2 Clinical Trial underwent serious adverse events; (4) as a result of the foregoing, the Company faced increased risks in maintaining the advancement of Zygel and an elevated threat to Zynerba procuring FDA approval to commercialize Zygel for the treatment of DEE in children and adolescents; and (5) the Company failed to maintain disclosure controls and internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

11. The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

---

hospitalization, results in persistent or significant disability or incapacity, may have caused a congenital anomaly or birth defect, or requires intervention to prevent permanent impairment or damage.

12. Also in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

13. The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected the Company, its Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO") to a federal securities fraud class action lawsuit pending in the United States District Court for the Eastern District of Pennsylvania (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

14. On November 25, 2020, Judge Nitza I. Quiñones Alejandro denied defendants motion to dismiss the amended complaint in the Securities Class Action in its entirety, finding that defendants' statements on Zynerba's website and in its SEC filings about the safety and benefits of its only product in development, Zygel, were "sufficient . . . to state a claim for securities fraud." *See Whiteley v. Zynerba Pharmaceuticals, Inc. et al*, No. 2:19-cv-04959-NIQA (E.D. Pa. Nov. 25, 2020), Order, at 2.

15. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the CEO's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Zynerba's Board of Directors (the "Board") cannot consider a demand to

commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f).

17. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

18. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

19. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

20. Venue is proper in this District because Zynerba is incorporated in this District. In addition, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

21. Plaintiff is a current shareholder of Zynerba. Plaintiff has continuously held Zynerba common stock at all relevant times.

### Nominal Defendant Zynerba

22. Zynerba is a Delaware corporation with its principal executive offices at 80 W. Lancaster Avenue, Suite 300, Devon, PA 19333. Zynerba's shares trade on the Nasdaq Global Market ("NASDAQ") under the ticker symbol "ZYNE."

**Defendant Anido**

23. Defendant Anido has served as the Company's CEO and Chairman of the Board since October 2014. According to the Company's Schedule 14A filed with the SEC on April 23, 2020 (the "2020 Proxy Statement"), as of April 1, 2020, Defendant Anido beneficially owned 1,278,761 shares of the Company's common stock, which represented 5.23% of the Company's outstanding shares of common stock on that date. Given that the price per share of the Company's common stock at the close of trading on April 1, 2020 was $3.41, Defendant Anido owned approximately $4.4 million worth of Zynerba stock.

24. For the fiscal year ended December 31, 2019, Defendant Anido received $1,369,571 in compensation from the Company. This included $568,218 in salary, $334,112 in non-equity incentive plan compensation, $413,149 in option awards, and $54,092 in all other compensation.

25. The Company's 2020 Proxy Statement stated the following about Defendant Anido:

> *Armando Anido* has served as chairman of our Board and as our chief executive officer since October 2014. Prior to joining our company, Mr. Anido served as our business consultant from May 2014 to October 2014. Mr. Anido has more than 35 years of executive, operational and commercial leadership experience in the pharmaceutical industry. Mr. Anido served as chief executive officer and as a director of NuPathe, Inc. ("NuPathe"), a publicly-traded specialty pharmaceutical company, from July 2012 through March 2014, during which time he led the company through U.S. Food and Drug Administration ("FDA") approval of its lead product Zecuity®, a transdermal patch for migraines. Prior to joining NuPathe, Mr. Anido served as chief executive officer and president and as a director of Auxilium Pharmaceuticals, Inc. ("Auxilium"), a specialty pharmaceutical company, from July 2006 through December 2011, where he led the company in its commercialization of its lead product, Testim®, a testosterone gel. Additionally, Mr. Anido led the company through the FDA approval and commercialization of Xiaflex®, an injectable collagenase for Dupuytren's Contracture. Mr. Anido currently serves as a director of Auris Medical, a pharmaceutical company, and has held such position since April 2016, and as a director of Scynexis, Inc. a pharmaceutical company, and has held such position since January 2019. He formerly served as a director of Aviragen Therapeutics, a pharmaceutical company,

> from October 2015 to March 2018, Respira Therapeutics, Inc., a pharmaceutical company, from May 2012 through September 2014, and Adolor Corporation, a pharmaceutical company, from September 2003 through December 2011. Mr. Anido holds a B.S. in Pharmacy and an MBA, both from West Virginia University.
>
> ***Skills and Qualifications:*** With more than 35 years of experience in the pharmaceutical industry, Mr. Anido brings valuable executive, operational and commercial expertise to our Board.

**Defendant Fickenscher**

26. Defendant Fickenscher has served as the Company's CFO and Vice President of Corporate Development since September 2016. According to the 2020 Proxy Statement, as of April 1, 2020, Defendant Fickenscher beneficially owned 242,940 shares of the Company's common stock, which represented 1.02% of the Company's outstanding shares of common stock on that date. Given that the price per share of the Company's common stock at the close of trading on April 1, 2020 was $3.41, Defendant Fickenscher owned over $828,425 worth of Zynerba stock.

27. For the fiscal year ended December 31, 2019, Defendant Fickenscher received $824,107 in compensation from the Company. This included $390,411 in salary, $158,347 in non-equity incentive plan compensation, $227,487 in option awards, and $47,862 in all other compensation.

28. The Company's 2020 Proxy Statement stated the following about Defendant Fickenscher:

> *James E. Fickenscher* has served as our chief financial officer, vice president corporate development since September 2016. Mr. Fickenscher has more than 30 years of financial, business development and executive leadership experience in the pharmaceutical industry. Prior to joining our company, he served as the senior vice president, chief financial officer of Antares Pharma, Inc., a specialty pharmaceutical company, from November 2014 to September 2016. Previously, Mr. Fickenscher served as chief financial officer of Auxilium Pharmaceuticals, Inc., a specialty biopharmaceutical company, from May 2005 until August 2014. From January 2000 until April 2004, Mr. Fickenscher served as senior vice president chief financial officer of Aventis Behring L.L.C., a wholly owned subsidiary of Aventis, predecessor to Sanofi S.A. Mr. Fickenscher joined Aventis

> Behring L.L.C. in 1995 as vice president, business development and strategic planning and, from that time until 2000, also held the positions of general manager, Japan and vice president & general manager, Hemophilia Business Unit. Throughout his tenure at Aventis Behring L.L.C, he was also responsible for strategic planning. Prior to Aventis Behring L.L.C, Mr. Fickenscher worked at Rhone-Poulenc Rorer, predecessor to Sanofi S.A., in its Collegeville, PA and Paris, France offices and at Deloitte & Touche LLP. Mr. Fickenscher received his B.S. at Bloomsburg University of Pennsylvania. He is a member of the American Institute of Certified Public Accountants.

**Defendant Butler**

29. Defendant Butler has served as a Company director since April 2018. He also serves as a member of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. According to the 2020 Proxy Statement, as of April 1, 2020, Defendant Butler beneficially owned 43,333 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 1, 2020 was $3.41, Defendant Butler owned approximately $147,766 worth of Zynerba stock.

30. For the fiscal year ended December 31, 2019, Defendant Butler received $178,598 in compensation from the Company. This included $43,000 in fee earned or paid in cash and $135,598 in option awards.

31. The Company's 2020 Proxy Statement stated the following about Defendant Butler:

> *John P. Butler* has served as a member of our Board since April 2018. Mr. Butler has served as the president and chief executive officer and member of the board of directors of Akebia Therapeutics, Inc., a biopharmaceutical company, since September 2013 and July 2013, respectively where he has led the company through its initial public offering, multiple strategic partnering transactions and, most recently, its merger with Keryx Biopharmaceuticals, Inc. Previously Mr. Butler served as the chief executive officer of Inspiration Biopharmaceuticals, Inc., a biopharmaceutical company, that filed for protection under Chapter 11 of the U.S. Bankruptcy Code in October 2012 prior to the successful sale of its hemophilia assets to Cangene Corporation and Baxter International in early 2013. From 1997 to 2011, Mr. Butler held various positions of increasing strategic importance at Genzyme Corporation, a biopharmaceutical company, most recently serving as president of the company's rare genetic diseases business. Prior to his work at

> Genzyme, Mr. Butler held sales and marketing positions at Amgen and Hoffmann-La Roche. He was a member of the board of directors of Relypsa, Inc. from September 2013 to September 2016, and chairman of the board of directors of Keryx Biopharmaceuticals, Inc., a commercial stage company developing innovative products for people with renal disease, from December 2015 to September 2017. Mr. Butler received a B.A. in Chemistry from Manhattan College and an M.B.A. degree from Baruch College, City University of New York.
>
> ***Skills and Qualifications:*** Mr. Butler brings significant operational and commercial experience in the biotechnology sector to our Board, including the development and commercialization of products for the treatment of rare and near rare diseases

**Defendant Cooper**

32. Defendant Cooper has served as a Company director since August 2015. He also serves as the Company's Lead Independent Director, as a member of the Audit Committee, and as a member of the Nominating and Corporate Governance Committee. According to the 2020 Proxy Statement, as of April 1, 2020, Defendant Cooper beneficially owned 80,000 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 1, 2020 was $3.41, Defendant Cooper owned approximately $272,800 worth of Zynerba stock.

33. For the fiscal year ended December 31, 2019, Defendant Cooper received $202,098 in compensation from the Company. This included $66,500 in fee earned or paid in cash and $135,598 in option awards.

34. The Company's 2020 Proxy Statement stated the following about Defendant Cooper:

> *Warren D. Cooper, MB, BS, BSc, MFPM* has served as a member of our Board since August 2015. Dr. Cooper is a U.K.-trained physician with more than 40 years of experience in the global pharmaceutical industry. Since January 2017, Dr. Cooper has served as chief medical officer and a partner of Healthcare Royalty Partners, a healthcare investment firm. Prior to joining Healthcare Royalty Partners in January 2017, Dr. Cooper served as the president of Coalescence Inc., a healthcare and pharmaceutical development consultancy, where he held various positions since 1999. Dr. Cooper was the chief executive officer of Prism

> Pharmaceuticals, Inc., a venture-backed, specialty pharmaceutical company that he led from inception in September 2004 until the sale of the company to Baxter International in May 2011. His career in the pharmaceutical industry began with Merck, Sharp and Dohme and spanned 12 years, initially as a clinical research physician in the United Kingdom, then as head of European and, subsequently, Worldwide Clinical Research Operations for Merck Research Laboratories across all therapeutic areas. Moving to AstraMerck (now AstraZeneca PLC, or "AstraZeneca"), in a broad clinical development role, he eventually led that company's cardiovascular business division, a role with full business lifecycle leadership from in-licensing through development, to P&L responsibility for sales and marketing. Dr. Cooper is a member of the Faculty of Pharmaceutical Medicine of the Royal Colleges of Physicians of the United Kingdom. He has previously served on the boards of directors of Nutrition 21, Inc., Nuron Biotech Inc., Cardiorentis AG and the World Affairs Council of Philadelphia. Dr. Cooper holds a B.Sc. in Physiology, an M.B. and a B.S., each from the London Hospital, University of London.
>
> ***Skills and Qualifications:*** With more than 40 years of experience in the global pharmaceutical industry, Dr. Cooper brings valuable expertise in pharmaceutical company leadership and clinical pharmaceutical research to our Board.

**Defendant Federici**

35. Defendant Federici has served as a Company director since August 2015. He also serves as the Chair of the Audit Committee. According to the 2020 Proxy Statement, as of April 1, 2020, Defendant Federici beneficially owned 87,865 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 1, 2020 was $3.41, Defendant Federici owned approximately $299,620 worth of Zynerba stock.

36. For the fiscal year ended December 31, 2019, Defendant Federici received $190,598 in compensation from the Company. This included $55,000 in fee earned or paid in cash and $135,598 in option awards.

37. The Company's 2020 Proxy Statement stated the following about Defendant Federici:

> *William J. Federici* has served as a member of our Board since August 2015. Mr. Federici served as senior vice president and chief financial officer of West Pharmaceutical Services, Inc., a publicly traded global pharmaceutical technology

> company, from August 2003 until June 2018. He served as a member of the board of directors and chairman of the Audit committee at NuPathe from January 2011 until February 2014. From June 2002 until August 2003, he was national industry director for Pharmaceuticals of KPMG LLP, and prior thereto, he was an audit partner with Arthur Andersen, LLP. Mr. Federici holds a B.A. in Economics and an M.B.A. in Professional Accounting from Rutgers University and is a Certified Public Accountant.
>
> ***Skills and Qualifications:*** With his leadership experience in the global pharmaceutical and accounting industries, Mr. Federici brings valuable expertise in financial and audit-related matters to our Board.

**Defendant Harrison**

38. Defendant Harrison served as a Company director from August 2015 until he resigned effective April 30, 2019. He also served as the Chair of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee.

39. For the fiscal year ended December 31, 2019, Defendant Harrison received $24,250 in compensation from the Company which consisted entirely of fee earned or paid in cash.

40. The Company's Schedule 14A filed with the SEC on April 25, 2019 (the "2019 Proxy Statement") stated the following about Defendant Harrison:

> ***Thomas L. Harrison, LH.D*** has served as a member of our Board since August 2015. Dr. Harrison is a noted author and speaker and since April 2013, has served as chairman emeritus of Diversified Agency Services, the world's largest group of marketing services companies, and a division of Omnicom Group, Inc., or Omnicom. In 1987 he founded Harrison & Star Business Group, a healthcare marketing agency that was acquired by Omnicom in 1992. From 1992 until 1997, he served as chairman of the Harrison & Star Group and chairman of diversified healthcare communications for Omnicom. In 1997, Dr. Harrison was appointed president of Diversified Agency Services, and in 1998 was named chairman and chief executive, serving until 2011. In 1980 he began his agency career at Rolf Werner Rosenthal, a mid-sized healthcare advertising agency. From 1974 until 1980 he served in sales and marketing roles at Pfizer, Inc. Dr. Harrison is a member of the Executive Committee of the Montefiore Health System, and served as a fellow of the New York Academy of Medicine from 2004 to 2015. He is a governor of the New York Academy of Sciences where he sits on the Sackler Global Nutrition Committee. Dr. Harrison served as a board member of Dipexium Pharmaceuticals, Inc. from 2012 to 2017 and as a board member of rVue Inc., a digital out-of-home media company from 2013 to 2017. In 2014, he was appointed to the boards of Social Growth Technologies, Inc., where he served until Social

> Growth Technologies, Inc.'s acquisition, and of Fifth Street Asset Management Inc. where he serves as lead independent director and chairman of the audit committee. He previously served as a board member of each of the New York Chapter of the Arthritis Foundation, ePocrates, Inc., a publicly traded healthcare information company until its March 2013 acquisition by athenahealth, Inc., and The Morgans Hotel Group (2006-2013). Dr. Harrison holds a M.S. in Cell Biology, Physiology and Biochemistry, and received an honorary doctorate in 2007, from West Virginia University. With more than 40 years of experience in the pharmaceutical and healthcare advertising industries, Dr. Harrison brings valuable expertise in pharmaceutical company leadership, pharmaceutical sales and healthcare advertising and marketing to our Board.

**<u>Defendant Kisner</u>**

41. Defendant Kisner has served as a Company director since August 2015. He also serves as the Chair of the Compensation Committee. According to the 2020 Proxy Statement, as of April 1, 2020, Defendant Kisner beneficially owned 80,000 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 1, 2020 was $3.41, Defendant Kisner owned $272,800 worth of Zynerba stock.

42. For the fiscal year ended December 31, 2019, Defendant Kisner received $182,473 in compensation from the Company. This included $46,875 in fee earned or paid in cash and $135,598 in option awards.

43. The Company's 2020 Proxy Statement stated the following about Defendant Kisner:

> *Daniel L. Kisner, MD* has served as a member of our Board since August 2015. Dr. Kisner has served as an independent consultant to the pharmaceutical/biotech industry since 2011. From 2003 until 2011 he served as a venture partner/partner at Aberdare Ventures, a venture firm with a focus on investing in healthcare technology companies. Prior to that he was president and chief executive officer of Caliper Technologies Corp. ("Caliper") from 1999 until 2003, and served as chairman of Caliper until 2008. He led Caliper from a startup dealing with microfluidic lab-on-a-chip technology to a publically [sic] traded commercial company. From 1991 until 1999, he served as chief operating officer and president of Isis Pharmaceuticals, Inc., a biomedical pharmaceutical company. Prior thereto, Dr. Kisner was division vice president of Pharmaceutical Development at Abbott Laboratories and vice president of Clinical Research at SmithKline Beckman Laboratories. In addition, he previously held a tenured position at the University of

> Texas School of Medicine at San Antonio and is certified by the American Board of Internal Medicine in Internal Medicine and Medical Oncology. Dr. Kisner served on the board of directors of Tekmira Pharmaceuticals from 2010 until March 2015 and Lpath Inc. from July 2012 until December 2016, and he currently serves on the boards of directors of Dynavax Technologies Corporation and Conatus Pharmaceuticals Inc. Dr. Kisner holds a B. A. degree from Rutgers University and an M.D. from Georgetown University.
>
> ***Skills and Qualifications:*** With more than 30 years of healthcare technology experience, Dr. Kisner brings valuable expertise in healthcare technology company leadership and investing, including prior experience in growing a research-stage company to a commercially successful, publicly-traded company, to our Board.

**<u>Defendant Moch</u>**

44. Defendant Moch has served as a Company director since August 2015. He also serves as a member of the Audit Committee and as a member of the Compensation Committee. According to the 2020 Proxy Statement, as of April 1, 2020, Defendant Moch beneficially owned 92,055 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 1, 2020 was $3.41, Defendant Moch owned approximately $313,908 worth of Zynerba stock.

45. For the fiscal year ended December 31, 2019, Defendant Moch received $183,848 in compensation from the Company. This included $24,125 in fee earned or paid in cash and $159,723 in option awards.

46. The Company's 2020 Proxy Statement stated the following about Defendant Moch:

> *Kenneth I. Moch* has served as a member of our Board since August 2015. Mr. Moch has more than 35 years of experience in managing and financing biomedical technologies, and has played a key role in building five life science companies. From October 2016 to March 2020, Mr. Moch served as the president and chief executive officer of Cognition Therapeutics, Inc. He previously was the managing partner of The Salutramed Group, LLC, from September 2015 until October 2016, where he provided strategic and tactical counsel to the biotechnology and pharmaceutical industries. Prior to that, he served as president of Euclidian Life Sciences Advisors, a strategic advisory firm for life sciences companies, from April 2014 until September 2015. From April 2010 to April 2014, he served as president and chief executive officer, and as a director, of Chimerix,

> Inc., having joined the company as chief operating officer in June 2009. Previously, he was president and chief executive officer of three life science companies — BioMedical Enterprises, Inc., Alteon, Inc., and Biocyte Corporation — and was a co-founder and vice president of The Liposome Company, Inc. He also served as managing director of Healthcare Investment Banking at ThinkEquity Partners and as a management consultant with McKinsey & Company. Mr. Moch has served as a director of Gamida Cell, Ltd, a biopharmaceutical company since September 2016. In the public policy arena, Mr. Moch currently is a member of the board of the Biotechnology Innovation Organization, serving as chair of the Bioethics Committee, and previously served as chairman of BioNJ. Mr. Moch holds an A.B. in Biochemistry from Princeton University and an M.B.A. with emphasis in Finance and Marketing from the Stanford Graduate School of Business.
>
> ***Skills and Qualifications:*** With more than 25 years of experience in the biomedical technology and pharmaceutical industries, Mr. Moch brings valuable expertise in biomedical technology company leadership and financing matters to our Board.

**Defendant Stephenson**

47. Defendant Stephenson has served as a Company director since February 2019. She also serves as the Chair of the Nominating and Corporate Governance Committee. According to the 2020 Proxy Statement, as of April 1, 2020, Defendant Stephenson beneficially owned 11,667 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 1, 2020 was $3.41, Defendant Stephenson owned over $39,784 worth of Zynerba stock.

48. For the fiscal year ended December 31, 2019, Defendant Stephenson received $295,032 in compensation from the Company. This included $36,792 in fee earned or paid in cash and $258,240 in option awards.

49. The Company's 2020 Proxy Statement stated the following about Defendant Stephenson:

> *Pamela Stephenson* was appointed as a member of our Board of Directors in February 2019. Ms. Stephenson has more than 20 years of experience leading the development and implementation of pharmaceutical marketing plans. Since March 2019, Ms. Stephenson has served as chief commercial officer for Albireo

> Pharma, Inc., a publicly traded biopharmaceutical company. Prior to that, she served as a vice president at Vertex Pharmaceuticals, Inc. ("Vertex"), a publicly traded global biotechnology company, from July 2008 to March 2019, where she was responsible for leading the global market access and pricing strategy for current and future products. Earlier in her tenure at Vertex, Ms. Stephenson led marketing and sales activities for the company's hepatitis C and cystic fibrosis lines of business, and oversaw the U.S. launches of Incivek® (telaprevir) and Orkambi® (lumacaftor/ivacaftor). Prior to Vertex, Ms. Stephenson held roles of increasing strategic importance at Pfizer Inc., a publicly traded global pharmaceutical company, from October 1998 to June 2008. Ms. Stephenson received her B.A. from Brown University and M.P.H. from the Boston University School of Public Health.
>
> ***Skills and Qualifications:*** With her extensive experience in the commercialization and marketing of pharmaceutical products, including for the treatment of rare and near rare diseases, Ms. Stephenson brings valuable expertise in commercial planning, market development, product launch and market access to our Board.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

50. By reason of their positions as officers, directors, and/or fiduciaries of Zynerba and because of their ability to control the business and corporate affairs of Zynerba, the Individual Defendants owed Zynerba and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Zynerba in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Zynerba and its shareholders so as to benefit all shareholders equally.

51. Each director and officer of the Company owes to Zynerba and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

52. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Zynerba, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

53. To discharge their duties, the officers and directors of Zynerba were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

54. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Zynerba, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Zynerba's Board at all relevant times.

55. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this

complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

56. To discharge their duties, the officers and directors of Zynerba were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Zynerba were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Zynerba's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Zynerba conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Zynerba and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Zynerba's operations would comply with all

applicable laws and Zynerba's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

57. Each of the Individual Defendants further owed to Zynerba and the shareholders the duty of loyalty requiring that each favor Zynerba's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

58. At all times relevant hereto, the Individual Defendants were the agents of each other and of Zynerba and were at all times acting within the course and scope of such agency.

59. Because of their advisory, executive, managerial, and directorial positions with Zynerba, each of the Individual Defendants had access to adverse, non-public information about the Company.

60. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Zynerba.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

61. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

62. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price.

63. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Zynerba was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

64. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or

substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

65. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Zynerba, and was at all times acting within the course and scope of such agency.

## ZYNERBA'S CODE OF CONDUCT

66. Zynerba's Code of Conduct provides that it "applies to all officers, directors and employees of the Company and its subsidiaries" and that "the term 'employee' refers to all officers, directors and employees of the Company and its subsidiaries[.]" The Code of Conduct also states that it "sets out basic principles to guide officers, directors and employees of the Company" and that the Board "shall be responsible for monitoring compliance with the Code and shall assess the adequacy of the Code periodically[.]" Moreover, the Code of Conduct requires that "[a]ll of the Company's officers, directors and employees must use good common sense and judgment to conduct themselves accordingly and seek to avoid even the appearance of improper behavior."

67. The Code of Conduct states that its purpose is to:

> (1) promote honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships; (2) promote full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the [SEC] and in other public communications made by the Company; (3) promote compliance with applicable laws, rules and regulations; (4) promote the protection of Company assets, including corporate opportunities and confidential information; (5) promote the prompt internal reporting of violations of the Code to an appropriate person or persons identified in the code; and (6) ensure accountability for adherence to the Code.

68. In a section titled, "Compliance with Laws, Rules and Regulations," the Code of Conduct states the following, in relevant part, "[t]he Company requires that all employees comply with all laws, rules and regulations applicable to the Company, both in letter and in spirit" which

includes "the development, testing, approval, manufacture, marketing and sale of Company products and product candidates" and "the submission of false or misleading financial information."

69. The section titled "Compliance with Laws, Rules and Regulations," of the Code of Conduct further states that "Employees are expected to use good judgment and common sense in seeking to comply with all applicable laws, rules and regulations and to seek advice when there is any uncertainty. Any violations of laws, rules and regulations can result in civil and criminal penalties as well as disciplinary action from the Company. Accordingly, any suspected noncompliance with applicable laws and/or related Company policies should be reported to the Compliance Officer."

70. The section titled "Compliance with Laws, Rules and Regulations," of the Code of Conduct specifically cites to the Federal Food Drug & Cosmetic Act ("FDCA") which it notes is the "primary statute enforced by the [FDA]" and that it "establishes the regulatory framework under which pharmaceutical products may be approved for the market." The Code of Conduct further provides that, among other things, the FDCA "covers adverse event reporting, development of pharmaceuticals, [and] clinical trial guidance[.]"

71. In a section titled, "Avoid Conflicts of Interest," the Code of Conduct states the following, in relevant part, "[e]mployees should always act in the best interest of the Company and not permit outside interests to interfere with their job duties" and that "[f]or purposes of the Code, a potential conflict of interest occurs when an employee's outside interests (for example, financial or personal) interfere with the Company's interests or the employee's work-related duties." The Code of Conduct further states the following, in relevant part:

> Any direct or indirect conflict of interest between the Company and any employee is prohibited unless otherwise consented to by the Company. The employee has a

> responsibility to the Company to disclose any situation that is, or reasonably could be expected to give rise to, a conflict of interest.

72. In a section titled, "Honest and Ethical Conduct and Fair Dealing," the Code of Conduct states the following, in pertinent part:

> The Company is committed to achieving the highest standards of professionalism and ethical conduct in its operations and activities and expects its employees to conduct business according to the highest ethical standards of conduct, in addition to complying with all applicable laws, rules and regulations, including antitrust and competition laws.
>
> The Company has an interest in maintaining a fair and competitive marketplace and friendly work environment. In order to achieve that standard, the Company expects its employees to maintain honest and ethical standards dealing with each other and the Company's competitors, as well as when transacting business with External Parties. Employees must not take unfair advantage of anyone, including fellow employees, through the manipulation, concealment or abuse of privileged information, misrepresentation of material facts or any other intentional unfair-dealing practice. Statements regarding the Company's products and services must not be untrue, misleading, deceptive or fraudulent. In addition to the maintenance of honest and ethical standards in disseminating information, employees must gather information about other companies and organizations, including competitors, using appropriate methods. Stealing proprietary information, knowingly possessing trade secret information that was obtained without the owner's consent, or inducing such disclosures by past or present employees of other companies is prohibited. Each employee should endeavor to respect the rights of and deal fairly with the Company's External Parties, competitors and employees.

73. In a section titled, "Public Communication and Social Media," the Code of Conduct states the following, in relevant part:

> The Company must monitor public communication about the Company in order to maintain credibility and a positive reputation in the community. News media can have a direct impact on the Company's profitability, the market value of the Company's securities, and the Company's ability to achieve its mission. The Company's policy is to provide timely, accurate and complete information in response to media inquiries consistent with its obligations to maintain the confidentiality of proprietary information and to prevent selective disclosure of market-sensitive financial and other material information. The Company is also required by federal securities laws to publicly disclose all material, non-public information that has been provided to securities professionals or stockholders.

74. In a section titled, "Report with Integrity," the Code of Conduct states the following:

> The Company has an obligation to make and keep books, records and accounts that, in reasonable detail, accurately and fairly reflect the Company's transactions and to maintain tax records and prepare tax returns that comply with applicable laws, rules and regulations. The Company must also maintain a system of internal accounting controls that meet applicable laws, rules and regulations, and prepare financial statements in accordance with generally accepted accounting principles and applicable laws, rules and regulations. All employees who are responsible for any aspect of the Company's internal accounting controls and financial and tax reporting systems (including, but not limited to, the Chief Executive Officer, the Chief Financial Officer, the principal accounting officers and persons performing similar functions) must conduct themselves using high ethical standards of integrity and honesty, in a manner that allows the Company to meet accounting and legal requirements and to prepare financial reports and financial statements that are not false or misleading, and that present full, fair, accurate, timely and understandable disclosure in the Company's periodic reports and other public communications.
>
> 1. No employee, officer or director may override, or direct others to override, the Company's established system of internal controls over financial reporting and disclosure.
>
> 2. No fund, asset or liability of the Company which is not fully and properly disclosed and recorded on the Company's books and records shall be created or permitted to exist.
>
> 3. Transactions of the Company are to be executed only in accordance with management's general or specific authorizations.
>
> 4. No false, artificial or misleading entries may be made in the books and records of the Company for any reason and no employee may engage in any arrangement that results in such prohibited act.
>
> 5. No transaction shall be effected and no payment on behalf of the Company may be approved or made with the intention or understanding that any part of the transaction or payment is to be used for any purpose other than that described by the documents supporting the transaction or payment.
>
> 6. Any uncertainty by an employee about judgments concerning accounting or tax matters should be discussed with a superior; when in doubt, ask for guidance.
>
> No one shall take any action to fraudulently influence, coerce, manipulate or mislead any internal or external auditor engaged in the performance of an audit of the Company's financial statements.

75. In a section titled, "Reporting Suspected Non-Compliance/Whistleblower Hotline," the Code of Conduct states the following:

> Suspected violations of applicable laws, rules, regulations, Company policies or the Code, suspected fraudulent activity, or any concerns or complaints regarding accounting, internal accounting controls or auditing matters should be reported by employees either openly or on an anonymous basis[.]
>
> * * *
>
> [N]othing in the Code should discourage you from reporting any illegal activity, including any violation of the securities laws, antitrust laws, environmental laws or any other federal, state or foreign law, rule or regulation, to the appropriate regulatory authority.

76. In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Individual Defendants' scheme to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, violations of the Exchange Act, and aiding and abetting thereof. Also in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

77. Zynerba is a specialty pharmaceutical company based in Devon, Pennsylvania, focused on developing and commercializing proprietary next-generation synthetic CBD therapeutics formulated for transdermal delivery. Zynerba claims to be a leader in pharmaceutically-produced transdermal cannabinoid therapies for rare and near-rare neuropsychiatric disorders such as (1) FXS, (2) autism spectrum disorder, (3) 22q11.2 deletion

syndrome, also known as DiGeorge syndrome, and (4) DEE. Zynerba's sole drug candidate, Zygel, is a patent-protected transdermal CBD gel that is intended to treat patients suffering from the aforementioned neuropsychiatric disorders. Zygel is supposedly the only pharmaceutically produced CBD formulated as a permeation-enhanced gel for transdermal administration.

78. Formerly known as AllTranz, the Company was incorporated in Delaware in January 2007 and was initially headquartered in Lexington, Kentucky. In June 2007, the Company merged with AllTranz LLC and was later reorganized and recapitalized pursuant to another merger in May 2014. A few months later, in August 2014, the Company rebranded as Zynerba and moved its operations to Pennsylvania. On August 5, 2015, the Company went public in an initial public offering, which raised proceeds totaling approximately $42 million.

79. Zynerba has devoted a substantial amount of its resources to the development of Zygel. Since inception, the Company has generated significant operating losses and has functioned on capital through the issuance of equity securities. Zynerba's net losses for the years ended December 31, 2019, 2018, 2017, and 2016 were approximately $32.9 million, $39.9 million, $32.0 million, and $23.4 million, respectively. Furthermore, according to the Company's annual report filed on Form 10-K with the SEC on March 10, 2020, Zynerba "expect[s] to continue to incur significant expenses and operating losses for the foreseeable future." As of March 7, 2019, the Company had 25 full-time employees. As of March 4, 2020, the Company had 28 full-time employees.

80. The recent trend towards the legalization of medical cannabis and the decriminalization of recreational cannabis in some countries and states has led to a significant increase in demand for cannabis related products. Since 1996, 36 states and four U.S. territories, including the District of Columbia, Guam, Puerto Rico, and the U.S. Virgin Islands have allowed

for the use of medicinal use of cannabis.[7] Indeed, on December 4, 2020, the U.S. House of Representatives voted to pass a bill that aims, among other things, to decriminalize cannabis at the federal level.

81. Although the FDA has not approved a marketing application for cannabis for the treatment of any disease or condition, the agency has approved one cannabis-derived drug product, Epidiolex—an oral solution developed by GW Pharmaceuticals Plc, which contains a purified form of the drug substance CBD for the treatment of epilepsy.[8]

82. To obtain FDA approval of Zygel, the Company must engage in three phases of clinical trials, as required by the FDA's rules for all newly developed drug candidates. In Phase 1 trials, researchers test an experimental drug or treatment in a small group of people for the first time. The researchers evaluate the treatment's safety, determine a safe dosage range, and identify side effects. In Phase 2 trials, the experimental drug or treatment is given to a larger group of people to see if it is effective and to further evaluate its safety. In Phase 3 trials, the experimental study drug or treatment is given to large groups of people and researchers confirm its effectiveness, monitor side effects, compare it to commonly used treatments, and collect information that will allow the experimental drug or treatment to be used safely.

83. According to the FDA's rules and regulations, an applicant must report each adverse drug experience that is both "serious and unexpected" within 15 days from initial receipt of the information. Under the FDA's rules and regulations, a serious adverse drug experience is defined as an adverse drug experience occurring at any dose that results in any of the following

---

[7]https://www.ncsl.org/research/health/state-medical-marijuana-laws.aspx. Last visited December 2, 2020.

[8] Epilepsy is a central nervous system (neurological) disorder in which brain activity becomes abnormal, causing seizures or periods of unusual behavior, sensations, and sometimes loss of awareness.

outcomes: "[d]eath, a life-threatening adverse drug experience, inpatient hospitalization or prolongation of existing hospitalization, a persistent or significant disability/incapacity, or a congenital anomaly/birth defect." Notwithstanding, an adverse experience may also constitute a serious adverse drug experience when it "may jeopardize the patient or subject and may require medical or surgical intervention to prevent one of the [foregoing] outcomes." If the reaction is "unexpected fatal or life-threatening," the sponsor of the trial must notify the FDA within 7 calendar days after receipt of that information.

84. Zynerba's initial drug candidate, ZYN001, was a pro-drug of THC that purportedly enabled effective transdermal delivery of THC via a patch for the treatment of patients suffering from fibromyalgia and peripheral neuropathic pain. However, after receiving lackluster "top line results" from a Phase 1 study, the Company "paused the development" of the drug to "focus its development efforts" on Zygel.

85. After reporting that Zygel was shown to be "safe and well tolerated" in its Phase 1 clinical trial, Zynerba issued a press release on April 10, 2018 (the "April 2018 Press Release") titled, "Zynerba Pharmaceuticals Initiates Open-Label Phase 2 Trial of ZYN002 in Developmental and Epileptic Encephalopathies (DEE)," which announced that Zynerba had initiated the Phase 2 Clinical Trial, a six-month clinical trial in an open label multi-dose Phase 2 clinical trial designed to evaluate the efficacy and safety of Zygel in children and adolescents between the ages of 3 to 17, suffering from DEE. Approximately fifty patients with DEE participated in the Phase 2 Clinical Trial, which was conducted in Australia and New Zealand. According to the April 2018 Press Release, the primary endpoint[9] of the Phase 2 Clinical Trial was change in seizure frequency. An

[9] In clinical trials, an "endpoint" is an event or outcome that can be measured objectively to determine whether the intervention being studied is beneficial. The "primary endpoint" is the endpoint for which the trial is powered.

additional endpoint of the trial was the safety of Zygel, which the Company measured by adverse reactions in patients.

86. On December 17, 2018, Zynerba issued a press release announcing that it had completed enrollment in its Phase 2 Clinical Trial and that it would report top-line results in the third quarter of 2019. In the press release, the Company stated that participants in the study would complete a four-week baseline period to determine seizure frequency, initially receiving doses of 250 mg or 500 mg daily of Zygel during a two-week period and then receive doses of 250 mg up to 1,000 mg daily for 24 weeks.

87. In accordance with the FDA's rules and regulations, the Company generated a database that recorded events and patient experiences related to the safety of Zygel throughout each clinical trial in connection to the drug.

**The Individual Defendants Cause the Company to Conduct Stock Offerings, Including at Artificially Inflated Prices During the Relevant Period While the Individual Defendants Were Issuing False and Misleading Statements to the Public**

88. In light of the Company's recurrent net losses and the failure of its Phase 1 clinical test for ZYN001, the Individual Defendants endeavored to conduct offerings of Company stock during the Relevant Period in order to secure the funds the Company needed. Concurrently, the Individual Defendants made numerous statements to the investing public that grossly exaggerated the efficacy of Zygel and, in turn, the Company's business outlook and growth prospects, in order to artificially pump up the price of the Company's stock.

89. In June 2017, the Company entered into a Sales Agreement with Jefferies LLC ("Jefferies") to raise capital through the sale of Zynerba's common stock.

90. In July 2018, prior to the Relevant Period, the Company offered 4,062,500 shares of Zynerba's common stock at $8.00 per share resulting in $32.5 million in gross proceeds and $29.9 million in net proceeds.

91. Thereafter, pursuant to the sales agreement with Jefferies, the Company raised $18.7 million in gross proceeds and $18.1 million after deducting commissions and offering expenses through the sale of 3,439,523 shares of Zynerba's common stock in the first fiscal quarter of 2019.

92. Throughout the second fiscal quarter of 2019, during the Relevant Period, the Company raised $28.1 million in gross proceeds and $27 million in net proceeds through the sale of 2,082,031 shares of Zynerba's common stock at a weighted average selling price of $13.50 per share.

93. On August 30, 2019, the Company entered into a Controlled Equity Offering Sales Agreement (the "2019 Sales Agreement") with various sales agents for the sale of up to an additional $75 million worth of Zynerba's common stock. Pursuant to the 2019 Sales Agreement, the Company has conducted three more offerings after the Relevant Period whereby the Company sold Zynerba shares at a weighted average selling price of $5.22 per share, $7.00 per share, and $5.15 per share, respectively.

**<u>False and Misleading Statements</u>**

***March 11, 2019 Form 10-K***

94. On March 11, 2019, the Company filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2018 (the "2018 10-K"). The 2018 10-K was signed by Defendants Anido, Fickenscher, Butler, Cooper, Federici, Harrison, Kisner, Moch, and Stephenson, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Anido and Fickenscher attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

95. Regarding the Company's Phase 2 Clinical Trial, the 2018 10-K stated the following, in pertinent part:

> In April 2018, we initiated the Phase 2 BELIEVE 1 (Open Label Study to Assess the Safety and Efficacy of Zygel Administered as a Transdermal Gel to Children and Adolescents with Developmental and Epileptic Encephalopathy) clinical trial, a six-month open label multi-dose clinical trial designed to evaluate the efficacy and safety of Zygel in children and adolescents (three to 17 years) with DEE as classified by the International League Against Epilepsy (ILAE) (Scheffer et al. 2017). Enrollment in this study was complete in December 2018 and 48 patients with confirmed DEE are being dosed in the clinical trial, 27% of whom have either Dravet or Lennox-Gastaut syndrome. Enrolled patients will receive weightbased initial doses of 250 mg daily or 500 mg daily and during the maintenance phase patients may receive up to 1000 mg daily of Zygel. The primary endpoint is change in seizure frequency from baseline. We expect to report top line results from the BELIEVE 1 trial in the third quarter of 2019.

96. Furthermore, the 2018 10-K publicized Zygel's supposed value and flaunted it as an "effective treatment" for DEE patients. The 2018 10-K stated:

> We believe that Zygel may provide an effective treatment for epilepsy based on the anticonvulsant effects of CBD due to its ability to reduce neuronal hyperexcitability shown in multiple in vivo models of epilepsy and clinical trials conducted by third parties. Epilepsy specialists and patient organizations have shown considerable interest in the potential therapeutic role of CBD in adults with epilepsy and especially, children with DEE. GW Pharmaceuticals, PLC, or GW, has received approval from the U.S. FDA to market Epidiolex®, a sesame oil liquid formulation of highly concentrated plant-extracted CBD, in the United States for the treatment of Dravet Syndrome, or DS, and Lennox-Gastaut Syndrome, or LGS.

97. With respect to the Company's Phase 2 Clinical Trial, the Risk Factors section of the 2018 10-K provided vague and general language in stating: "***Because the results of preclinical studies and earlier clinical trials are not necessarily predictive of future results, Zygel may not have favorable results in our planned clinical trials.***" (Emphasis in original.)

98. The Risk Factors section of the 2018 10-K further provided more standard boilerplate language in stating that "***Failures or delays in our clinical trials of Zygel could result***

***in increased costs to us and could delay, prevent or limit our ability to generate revenue and continue our business.***" (Emphasis in original.)

99. The disclosures in the Risk Factors section of the 2018 10-K continued to contain generic and hypothetical language such as, "***The regulatory approval processes of the FDA, the EMA and other comparable foreign regulatory authorities are lengthy, time-consuming and inherently unpredictable, and if we are ultimately unable to obtain regulatory approval for our product candidates, our business will be substantially harmed.***" (Emphasis in original.)

100. The 2018 10-K also stated the following regarding forward-looking statements, in relevant part:

> - the results, cost and timing of our preclinical studies and clinical trials, including any delays to such clinical trials relating to enrollment or site initiation, as well as the number of required trials for regulatory approval and the criteria for success in such trials;
>
> * * *
>
> - legal and regulatory developments in the United States and foreign countries, including any actions or advice that may affect the design, initiation, timing, continuation, progress or outcome of clinical trials or result in the need for additional clinical trials[.]

101. Regarding the Company's disclosure controls, the 2018 10-K stated, in relevant part:

> ***Based on the evaluation of the effectiveness of the design and operation of our disclosure controls and procedures as of December 31, 2018, our Chief Executive Officer and Chief Financial Officer concluded that, as of such date, our disclosure controls and procedures were effective at the reasonable assurance level***.

(Emphasis added.)

102. Regarding the Company's internal controls, the 2018 10-K stated, in relevant part:

> Our management has assessed the effectiveness of our internal control over financial reporting as of December 31, 2018. In making this assessment,

> management used the criteria established by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control – Integrated Framework (2013). These criteria are in the areas of control environment, risk assessment, control activities, information and communication, and monitoring. Management's assessment included extensive documentation, evaluating and testing the design and operating effectiveness of its internal controls over financial reporting.
>
> ***Based on the Management's processes and assessment, as described above, management has concluded that, as of December 31, 2018, our internal control over financial reporting was effective***.

(Emphasis added.)

***2019 Zynerba Website***

103. Throughout the Relevant Period, the Company's website[10] maintained that Zygel "address[es] limitations of current treatments." Particularly, with respect to the "Potential Benefit of Zygel" the Company's website stated that Zygel, in comparison to the "oral administration" of CBD, "result(s) in a lower incidence of gastrointestinal side effects…" and "transdermal delivery of Zygel avoids the gastrointestinal tract and potential degradation to THC in stomach acid, which should minimize the risk of negative psychoactive effects."

***April 25, 2019 Proxy Statement***

104. On April 25, 2019, the Company filed the 2019 Proxy Statement. Defendants Anido, Butler, Cooper, Federici, Harrison, Kisner, Moch, and Stephenson, solicited the 2019 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

105. With respect to the Company's Code of Conduct, the 2019 Proxy Statement stated that it is "applicable to all of our employees, executive officers and directors." Additionally, the 2019 Proxy Statement stated that the Code of Conduct covers "fundamental ethical and

[10] https://zynerba.com/in-development/zygel/. Last visited December 2, 2020.

compliance-related principles and practices such as accurate accounting records and financial reporting, avoiding conflicts of interest, the protection and use of our property and information, compliance with legal and regulatory requirements and commitments to environmental and social issues."

106. The 2019 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Conduct.

107. The 2019 Proxy Statement also called for, among other things: (1) the election of eight nominees as directors; and (2) the ratification of the appointment of KPMG LLP as the Company's independent registered public accounting firm for the fiscal year ended December 31, 2019.

108. The Individual Defendants also caused the 2019 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, including linking incentive award opportunities that provided "a strong alignment between the interests of executive officers and long-term stockholders[]" while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

109. The 2019 Proxy Statement was materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) nearly every patient that participated in the Phase 2 Clinical Trial experienced treatment emergent adverse events; (2) most patients that participated in the Phase 2 Clinical Trial endured treatment related adverse

events; (3) more than 20% of the patients that participated in the Phase 2 Clinical Trial underwent serious adverse events; (4) as a result of the foregoing, the Company faced increased risks in maintaining the advancement of Zygel and an elevated threat to Zynerba procuring FDA approval to commercialize Zygel for the treatment of DEE in children and adolescents; and (5) the Company failed to maintain disclosure controls and internal controls.

***May 8, 2019 Form 10-Q***

110. On May 8, 2019, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended March 31, 2019 (the "1Q19 10-Q"). The 1Q19 10-Q was signed by Defendants Anido and Fickenscher and contained SOX certifications signed by Defendants Anido and Fickenscher attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

111. Regarding the Company's Phase 2 Clinical Trial, the 1Q19 10-Q stated the following, in pertinent part:

> In April 2018, we initiated the Phase 2 BELIEVE 1 (Open Label Study to Assess the Safety and Efficacy of Zygel Administered as a Transdermal Gel to Children and Adolescents with Developmental and Epileptic Encephalopathy) clinical trial, a six-month open label multi-dose clinical trial designed to evaluate the efficacy and safety of Zygel in children and adolescents (three to 17 years) with DEE as classified by the International League Against Epilepsy (ILAE) (Scheffer et al. 2017). Enrollment in this study was complete in December 2018 and 48 patients with confirmed DEE are being dosed in the clinical trial, 27% of whom have either Dravet or Lennox-Gastaut syndrome. ***Patients received weight-based initial doses of 250 mg or 500 mg daily and during the maintenance phase patients receive up to 1000 mg daily of Zygel***. The primary endpoint is change in seizure frequency from baseline. We expect to report top line results from the BELIEVE 1 trial in the third quarter of 2019.

(Emphasis added.)

112. Furthermore, the 1Q19 10-Q publicized Zygel's supposed value as a treatment for patients of various disorders. The 1Q19 10-Q stated, the following, in relevant part:

> We are currently evaluating ZygelTM, a patent-protected transdermal cannabidiol, or CBD, gel for the treatment of FXS, DEE and ASD. Prior to February 2019, Zygel was referred to as ZYN002. In 2017, we completed three Phase 2 clinical trials for Zygel and two of those studies have open-label extensions that are ongoing. In April 2018, we initiated an open-label Phase 2 clinical trial evaluating Zygel in children and adolescent patients with DEE, and in July 2018, we initiated what we believe will be a pivotal clinical trial evaluating Zygel in children and adolescent patients with FXS. In March 2019, we initiated an open-label Phase 2 clinical trial evaluating Zygel in children and adolescent patients with ASD. We intend to initiate a trial in 22q during the first half of 2019.
>
> Cannabinoids are a class of compounds derived from *Cannabis* plants. The two primary cannabinoids contained in *Cannabis* are CBD and Tetrahydrocannabinol, or THC. Clinical and preclinical data suggest that CBD has positive effects on treating behavioral symptoms of FXS, ASD, 22q and seizures in patients with epilepsy.

113. With respect to Risk Factors, the 1Q19 10-Q stated, "[t]here have been no material changes to the risk factors disclosed in our 2018 Annual Report."

114. The 1Q19 10-Q stated the following regarding the Company's controls and procedures:

> ***Based on the evaluation of the effectiveness of the design and operation of our disclosure controls and procedures as of March 31, 2019, our Chief Executive Officer and Chief Financial Officer concluded that, as of such date, our disclosure controls and procedures were effective at the reasonable assurance level***.
>
> * * *
>
> ***There were no changes in our internal control over financial reporting during the three months ended March 31, 2019 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting***.

(Emphasis added.)

115. The 1Q19 10-Q also stated the following regarding forward-looking statements, in relevant part:

- the results, cost and timing of our preclinical studies and clinical trials, including any delays to such clinical trials relating to enrollment or site initiation, as well as the number of required trials for regulatory approval and the criteria for success in such trials;

* * *

- legal and regulatory developments in the United States and foreign countries, including any actions or advice that may affect the design, initiation, timing, continuation, progress or outcome of clinical trials or result in the need for additional clinical trials[.]

***June 7, 2019 Presentation***

116. Zynerba published a slideshow presentation on June 7, 2019 (the "June 2019 Presentation).

117. The June 2019 Presentation stated "[w]ell tolerated, consistent with previously reported data; no SAEs."

118. The June 2019 Presentation touted Zygel's significant market potential and estimated that its commercialization would create "multi-billion-dollar market opportunity[.]" The June 2019 Presentation also stated:




***August 6, 2019 Form 10-Q***

119. On August 6, 2019, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended June 30, 2019 (the "2Q19 10-Q"). The 2Q19 10-Q was signed by Defendants Anido and Fickenscher and contained SOX certifications signed by Defendants Anido and Fickenscher attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

120. Regarding the Company's Phase 2 Clinical Trial, the 2Q19 10-Q stated the following, in pertinent part:

> In April 2018, we initiated the Phase 2 BELIEVE 1 (Open Label Study to Assess the Safety and Efficacy of Zygel Administered as a Transdermal Gel to Children

and Adolescents with Developmental and Epileptic Encephalopathy) clinical trial, a six-month open label multi-dose clinical trial designed to evaluate the efficacy and safety of Zygel in children and adolescents (three to 17 years) with DEE as classified by the International League Against Epilepsy (ILAE) (Scheffer et al. 2017). Enrollment in this study was complete in December 2018 and 48 patients with confirmed DEE are being dosed in the clinical trial, 27% of whom have either Dravet or Lennox-Gastaut syndromes. ***Patients received weight-based initial doses of 250 mg or 500 mg daily and during the maintenance phase patients receive up to 1000 mg daily of Zygel. The primary endpoint is change in seizure frequency from baseline***. We expect to report top line results from the BELIEVE 1 trial in September of 2019.

(Emphasis added.)

121. Furthermore, the 2Q19 10-Q publicized Zygel's supposed value as a treatment for patients of various disorders. The 2Q19 10-Q stated the following, in relevant part:

We are currently evaluating ZygelTM, a patent-protected transdermal cannabidiol, or CBD, gel for the treatment of FXS, DEE, ASD and 22q. In 2017, we completed three Phase 2 clinical trials for Zygel and two of those studies have open-label extensions that are ongoing. In April 2018, we initiated an open-label Phase 2 clinical trial evaluating Zygel in children and adolescent patients with DEE, and in July 2018, we initiated what we believe will be a pivotal clinical trial evaluating Zygel in children and adolescent patients with FXS. In March 2019, we initiated an open-label Phase 2 clinical trial evaluating Zygel in children and adolescent patients with ASD and in May 2019, we initiated an open-label Phase 2 clinical trial evaluating Zygel in children and adolescent patients with 22q.

Cannabinoids are a class of compounds derived from *Cannabis* plants. The two primary cannabinoids contained in *Cannabis* are CBD and Tetrahydrocannabinol, or THC. Clinical and preclinical data suggest that CBD has positive effects on treating behavioral symptoms of FXS, ASD, 22q and seizures in patients with epilepsy.

122. With respect to Risk Factors, the 2Q19 10-Q stated, "[t]here have been no material changes to the risk factors disclosed in our 2018 Annual Report."

123. The 2Q19 10-Q stated the following regarding the Company's controls and procedures:

***Based on the evaluation of the effectiveness of the design and operation of our disclosure controls and procedures as of June 30, 2019, our Chief Executive Officer and Chief Financial Officer concluded that, as of such date, our***

> ***disclosure controls and procedures were effective at the reasonable assurance level***.
>
> * * *
>
> ***There were no changes in our internal control over financial reporting during the three months ended June 30, 2019*** [sic] ***that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting***.

(Emphasis added.)

124. The 2Q19 10-Q stated that the Company had entered into an Open Market Sales Agreement with Jefferies in June 2017. Regarding the equity financing, in relevant part, the 2Q19 10-Q stated:

> In the second quarter of 2019, we sold and issued 2,082,031 shares of common stock under the Sales Agreement with Jefferies in the open market at a weighted average selling price of $13.50 per share, resulting in gross proceeds of $28.1 million. Net proceeds received after deducting commissions and offering expenses were $27.0 million. The last sale under the Sales Agreement was made on May 16, 2019. From June 2017 through May 16, 2019, we have cumulative gross proceeds of $50.0 million from shares sold in the open market under the Sales Agreement, which has terminated pursuant to its terms.

125. The 2Q19 10-Q also stated the following regarding forward-looking statements, in relevant part:

> - the results, cost and timing of our preclinical studies and clinical trials, including any delays to such clinical trials relating to enrollment or site initiation, as well as the number of required trials for regulatory approval and the criteria for success in such trials;
>
> * * *
>
> - legal and regulatory developments in the United States and foreign countries, including any actions or advice that may affect the design, initiation, timing, continuation, progress or outcome of clinical trials or result in the need for additional clinical trials[.]

***August 6, 2019 Form 8-K & Presentation***

126. On August 6, 2019, the Company filed a current report on Form 8-K with the SEC which attached a slideshow presentation dated August 2019 (the "August 2019 Presentation").

127. The August 2019 Presentation stated "[w]ell tolerated, consistent with previously reported data; no SAEs."

128. Like the June 2019 Presentation had done, the August 2019 Presentation also touted Zygel's significant market potential and estimated that its commercialization would create "multi-billion-dollar market opportunity[.]" The August 2019 Presentation also stated:



***August 30, 2019 Form 8-K***

129. Also on August 30, 2019, the Company filed a current report on Form 8-K with the SEC (the "August 2019 8-K"). Regarding an offering sales agreement the Company had entered into, the August 2019 8-K revealed that:

> On August 30, 2019, Zynerba Pharmaceuticals, Inc. (the "Company") entered into a Controlled Equity Offering[SM] Sales Agreement (the "Agreement") with Cantor Fitzgerald & Co., Canaccord Genuity LLC, H.C. Wainwright & Co., LLC and Ladenburg Thalmann & Co. Inc., as sales agents (the "Agents"), pursuant to which the Company may, from time to time, issue and sell shares of its common stock, par value $0.001 per share, in an aggregate offering price of up to $75.0 million (the "Shares").

130. Regarding amended employment agreements that the Company had entered into with, among others, Defendants Anido and Fickenscher, the August 2019 8-K stated:

> On August 30, 2019, the Company entered into amendments (the "Amendments") to the employment agreements with each of (i) Armando Anido, its Chief Executive Officer, … and (iii) James Fickenscher, its Chief Financial Officer, Vice President, Corporate Development (together, the "Executives") to, among other things, change from "single-trigger" to "double-trigger" change of control severance benefits.
>
> Under each Executive's existing employment agreement with the Company, the Executive was entitled to certain "single-trigger" severance benefits, ***which include base salary continuation and medical and dental insurance continuation*** ("Severance Benefits") in connection with a Change of Control (as defined in each respective employment agreement) of the Company, pursuant to which the Executive is entitled to such Severance Benefits in the event of his or her (i) resignation within thirty days of a Change of Control (as defined in each respective employment agreement) or (ii) termination without Cause or resignation for Good Reason within the ninety day period preceding a Change of Control or on or within twelve months following a Change of Control.
>
> As amended by the Amendments, each employment agreement now provides for "double-trigger" Severance Benefits in connection with a Change of Control, pursuant to which such Executive is entitled to such Severance Benefits in the event of his or her termination without Cause or resignation for Good Reason.

(Emphasis added.)

131. The statements referenced in ¶¶94-103 and 110-130 herein were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) nearly every patient that participated in the Phase 2 Clinical Trial experienced treatment emergent adverse events; (2) most patients that participated in the Phase 2 Clinical Trial endured treatment related adverse events; (3) more than 20% of the patients that participated in the Phase 2 Clinical Trial underwent serious adverse events; (4) as a result of the foregoing, the Company faced increased risks in maintaining the advancement of Zygel and an elevated threat to Zynerba procuring FDA approval to commercialize Zygel for the treatment of DEE in children and adolescents; and (5) the Company failed to maintain disclosure controls and internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**<u>The Truth Emerges</u>**

132. The truth emerged on September 18, 2019, when the Company issued the September 2019 Press Release, titled "Zynerba Pharmaceuticals Announces Positive Top Line Data from BELIEVE 1 Open Label Phase 2 Study of Zygel™ in Developmental and Epileptic Encephalopathies (DEE)." The September 2019 Press Release announced the results from the Phase 2 Clinical Trial. Specifically, the September 2019 Press Release divulged that: "[t]hrough six months of therapy, ***ninety-six percent (96%) of patients experienced a treatment emergent adverse event (TEAE) and 60% of patients experienced a treatment related adverse event***" and that "[t]en patients reported a serious adverse event (SAE***)***[.]" (Emphasis added.)

133. On this news, the price of the Company's stock fell $2.46 per share, or approximately 21.77%, from $11.30 per share at the close of trading on September 17, 2019, to $8.84 per share at the close of trading on September 18, 2019, on very heavy trading volume.

134. To date, the value of the Company's common stock has not recovered. For instance, as of December 3, 2020, Zynerba's common stock closed at $4.50 per share.

**DAMAGES TO ZYNERBA**

135. As a direct and proximate result of the Individual Defendants' conduct, Zynerba will lose and expend many millions of dollars.

136. Such expenditures include, but are not limited to, costs associated with and/or legal fees associated with the Securities Class Action filed against the Company, its CEO and its CFO, and any internal investigations and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

137. Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

138. As a direct and proximate result of the Individual Defendants' conduct, Zynerba has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

**DERIVATIVE ALLEGATIONS**

139. Plaintiff brings this action derivatively and for the benefit of Zynerba to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their

fiduciary duties as directors and/or officers of Zynerba, waste of corporate assets, unjust enrichment, violations of the Exchange Act, as well as the aiding and abetting thereof.

140. Zynerba is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

141. Plaintiff is, and has been at all relevant times, a shareholder of Zynerba. Plaintiff will adequately and fairly represent the interests of Zynerba in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

142. Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

143. A pre-suit demand on the Board of Zynerba is futile and, therefore, excused. At the time of filing of this complaint, the Board consists of the following seven individuals: Defendants Anido, Butler, Cooper, Federici, Kisner, Moch, and Stephenson (the "Directors"). Plaintiff needs only to allege demand futility as to four of the seven Directors that were on the Board at the time of the filing of this complaint.

144. Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to cause the Company to make false and misleading statements and omissions of material fact, all of which renders the Directors unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

145. In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. While investors were duped into believing the fraud perpetrated by the Individual Defendants, the Directors conducted stock offerings of the Company's common stock at artificially inflated prices so that the Company could remain afloat and, in turn, the Individual Defendants could continue to extract compensation, as detailed herein, out of Zynerba which has operated at significant net losses since inception. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

146. Additional reasons that demand on Defendant Anido is futile follow. Defendant Anido has served as the Company's CEO and Chairman of the Board since October 2014. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Anido with his principal occupation, and he receives handsome compensation, including $1,369,571 during 2019 for his services. Defendant Anido was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the Company's SEC filings referenced herein, which he either personally made, signed off on, or signed SOX certifications for. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Anido is a defendant in the Securities Class Action. For these reasons,

Defendant Anido breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

147. Additional reasons that demand on Defendant Butler is futile follow. Defendant Butler has served as a Company director since April 2018. He also serves as a member of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. Defendant Butler has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Butler signed, and thus personally made the false and misleading statements in the 2018 10-K. For these reasons, Defendant Butler breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

148. Additional reasons that demand on Defendant Cooper is futile follow. Defendant Cooper has served as a Company director since August 2015. He also serves as a member of the Audit Committee and as a member of the Nominating and Corporate Governance Committee. Defendant Cooper has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Cooper signed, and thus personally made the false and misleading statements in the 2018 10-K. For these reasons,

Defendant Cooper breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

149. Additional reasons that demand on Defendant Federici is futile follow. Defendant Federici has served as a Company director since August 2015. He also serves as the Chair of the Audit Committee. Defendant Federici has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Federici signed, and thus personally made the false and misleading statements in the 2018 10-K. For these reasons, Defendant Federici breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

150. Additional reasons that demand on Defendant Kisner is futile follow. Defendant Kisner has served as a Company director since August 2015. He also serves as the Chair of the Compensation Committee. Defendant Kisner has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Kisner signed, and thus personally made the false and misleading statements in the 2018 10-K. For these reasons, Defendant Kisner breached his fiduciary duties, faces a substantial

likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

151. Additional reasons that demand on Defendant Moch is futile follow. Defendant Moch has served as a Company director since August 2015. He also serves as a member of the Audit Committee and as a member of the Compensation Committee. Defendant Moch has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Moch signed, and thus personally made the false and misleading statements in the 2018 10-K. For these reasons, Defendant Moch breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

152. Additional reasons that demand on Defendant Stephenson is futile follow. Defendant Stephenson has served as a Company director since February 2019. She also serves as the Chair of the Nominating and Corporate Governance Committee. Defendant Stephenson has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Stephenson signed, and thus personally made the false and misleading statements in the 2018 10-K. For these reasons, Defendant Stephenson

breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

153. Additional reasons that demand on the Board is futile follow.

154. The Directors have extensive, longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For instance, Defendants Anido and Federici both served as directors to NuPathe, Inc. ("Nupathe") for multiple years: Defendant Anido served as Nupathe's CEO and as a director on Nupathe's board from July 2012 until March 2014 and Defendant Federici served as a director on Nupathe's board and as the Chair of Nupathe's Audit Committee from January 2011 until February 2014. Additionally, Defendants Anido and Fickenscher worked closely with one another at Auxilium Pharmaceuticals, Inc. ("Auxilium"). Specifically, Defendant Anido served as Auxilium's CEO and as a director on Auxilium's board from July 2006 until December 2011 and Defendant Fickenscher served as Auxilium's CFO from May 2005 until August 2014. Moreover, Defendants Anido, Cooper, Federici, Kisner, and Moch have each served together on the Company's Board for more than five years. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Directors would be futile.

155. Defendants Cooper, Federici, and Moch (the "Audit Committee Defendants") served as members of the Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for overseeing, among other things, the Company's quality and integrity of the Company's financial statements, the Company's compliance with legal and regulatory requirements, the Company's financial reporting

process, and the Company's internal controls over financial reporting. The Audit Committee Defendants failed to ensure the quality and integrity of the Company's financial statements, as they are charged to do under the Audit Committee Charter, allowing the Company to file false and misleading financial statements with the SEC and to fail to maintain internal controls. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

156. In violation of the Code of Conduct, the Directors conducted little, if any, oversight of the Individual Defendants' scheme to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, violations of Sections 14(a) of the Exchange Act. In violation of the Code of Conduct, the Directors failed to comply with laws and regulations, maintain the accuracy of company records, public reports and communications, and uphold the responsibilities related thereto. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

157. Zynerba has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Zynerba any part of the damages Zynerba suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

158. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision

exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

159. The acts complained of herein constitute violations of fiduciary duties owed by Zynerba's officers and directors, and these acts are incapable of ratification.

160. The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Zynerba. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Zynerba, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

161. If there is no directors' and officers' liability insurance, then the Directors will not cause Zynerba to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

162. Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of Section 14(a) of the Securities Exchange Act of 1934

163. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

164. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

165. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

166. Under the direction and watch of the Directors, the 2019 Proxy Statement failed to disclose, *inter alia*, that: (1) nearly every patient that participated in the Phase 2 Clinical Trial experienced treatment emergent adverse events; (2) most patients that participated in the Phase 2 Clinical Trial endured treatment related adverse events; (3) more than 20% of the patients that

participated in the Phase 2 Clinical Trial underwent serious adverse events; (4) as a result of the foregoing, the Company faced increased risks in maintaining the advancement of Zygel and an elevated threat to Zynerba procuring FDA approval to commercialize Zygel for the treatment of DEE in children and adolescents; and (5) the Company failed to maintain disclosure controls and internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

167. The Individual Defendants also caused the 2019 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, while failing to disclose that the Company's financial prospects were misrepresented as a result of false and misleading statements, causing the Company's share price to be artificially inflated and allowing the Individual Defendants to wrongfully benefit from the fraud alleged herein.

168. Moreover, the 2019 Proxy Statement was false and misleading when it discussed the Company's adherence to specific governance policies and procedures, including the Code of Conduct, due to the Individual Defendants' failures to abide by them and their causing the Company to issue false and misleading statements and/or omissions of material fact.

169. In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2019 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2019 Proxy Statement, including but not limited to, the election of directors and the ratification of the Company's independent auditor.

170. The false and misleading elements of the 2019 Proxy Statement led to the re-election of Defendants Anido, Butler, Cooper, Federici, Kisner, Moch, and Stephenson which allowed them to continue breaching their fiduciary duties to Zynerba.

171. The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2019 Proxy Statement.

172. Plaintiff on behalf of Zynerba has no adequate remedy at law.

**SECOND CLAIM**

**Against the Individual Defendants for Breach of Fiduciary Duties**

173. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

174. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Zynerba's business and affairs.

175. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

176. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Zynerba.

177. In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

178. In breach of their fiduciary duties owed to Zynerba, the Individual Defendants willfully or recklessly caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) nearly every patient that participated in the Phase 2 Clinical Trial experienced treatment emergent adverse events; (2) most

patients that participated in the Phase 2 Clinical Trial endured treatment related adverse events; (3) more than 20% of the patients that participated in the Phase 2 Clinical Trial underwent serious adverse events; (4) as a result of the foregoing, the Company faced increased risks in maintaining the advancement of Zygel and an elevated threat to Zynerba procuring FDA approval to commercialize Zygel for the treatment of DEE in children and adolescents; and (5) the Company failed to maintain disclosure controls and internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

179. The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact.

180. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Zynerba's securities.

181. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls,

even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Zynerba's securities.

182. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

183. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Zynerba has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

184. Plaintiff on behalf of Zynerba has no adequate remedy at law.

**THIRD CLAIM**

**Against Individual Defendants for Unjust Enrichment**

185. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

186. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Zynerba.

187. The Individual Defendants either benefitted financially from the improper conduct tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Zynerba that was tied to the performance or artificially inflated valuation of Zynerba, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

188. Plaintiff, as a shareholder and a representative of Zynerba, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from benefits, and other compensation, including any performance-based or valuation-based

compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

189. Plaintiff on behalf of Zynerba has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

190. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

191. As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

192. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

193. Plaintiff on behalf of Zynerba has no adequate remedy at law.

## FIFTH CLAIM

### Against Defendants Anido and Fickenscher for Contribution Under Sections 10(b) and 21D of the Exchange Act

194. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

195. Zynerba, along with Defendants Anido and Fickenscher are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Anido

and Fickenscher's willful and/or reckless violations of their obligations as officers and/or directors of Zynerba.

196. Defendants Anido and Fickenscher, because of their positions of control and authority as officers and/or directors of Zynerba, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Zynerba, including the wrongful acts complained of herein and in the Securities Class Action.

197. Accordingly, Defendants Anido and Fickenscher are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

198. As such, Zynerba is entitled to receive all appropriate contribution or indemnification from Defendants Anido and Fickenscher.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Zynerba, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Zynerba;

(c) Determining and awarding to Zynerba the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing Zynerba and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with

applicable laws and to protect Zynerba and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Zynerba to nominate at least four candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e) Awarding Zynerba restitution from the Individual Defendants, and each of them;

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

Dated: December 4, 2020

Respectfully submitted,

**FARNAN LLP**

/s/ Michael J. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market St., 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
Email: bfarnan@farnanlaw.com

mfarnan@farnanlaw.com

Of Counsel:

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net